# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CLIFFORD WARES | Criminal No. 15-cr-570 (ES)<br><br>Filed Electronically<br><br>**PRETRIAL MOTIONS** |

---

**BRIEF IN SUPPORT OF DEFENDANT CLIFFORD WARES'S PRETRIAL MOTIONS**

---

Thomas Ambrosio, Esq.
750 Valley Brook Avenue
Lyndhurst, NJ 07071
201.935.3005
*Attorney for Defendant Clifford Wares*

*On the brief:*

Thomas Ambrosio, Esq.

Dated: April 15, 2016

## SUMMARY OF PRETRIAL MOTIONS REQUESTED

1. Motion to suppress warrantless seizure of items from Wares's tent
2. Motion to suppress post arrest statements made by Wares
3. Motion waiving Wares's right to be present at trial
4. Motion requesting Wares's name be substituted with a pseudonym at trial in order to conceal his identity from the jurors
5. Objection to the authenticity of Government's proposed trial exhibits
6. Motion *in limine* to preclude the Government from introducing any evidence that Wares was a member of the on-line forum Beast Forum at BeastForum.com
7. Motion *in limine* to preclude the Government from introducing any evidence of a letter sent by the West Milford Board of Education to parents of children in the West Milford School system to ask their children if the children had made contact with Wares
8. Motion to compel Government to produce copies of photographs allegedly sent by Minor Victim 1 to Wares
9. Motion requesting hearing on any proposed Rule 404(b) evidence
10. Motion to dismiss indictment based upon violation of the Interstate Agreement on Detainers Act
11. Motion to sever counts 1-3 from counts 4-6
12. Motion for a Wade hearing to establish whether any out of court identification is unconstitutionally suggestive and thus inadmissible as evidence
13. Motion to compel government to preserve and produce rough notes
14. Motion to dismiss the indictment in the event that evidence or investigative notes were destroyed
15. Motion to compel timely production of all Jencks act material
16. Motion to be permitted to file additional motions as the need arises

<u>LIST OF EXHIBITS</u>

Exhibit 1 – Passaic County Sheriff's Office Investigation Report, dated July
31, 2012

Exhibit 2 -  Wares's Affidavit in support of his motion to suppress  post
arrest statements

Exhibit 3 – Photos of Wares's tent

Exhibit 4 - Wares's Affidavit in support of motion to suppress warrantless
seizure of items from his tent

Exhibit 5 - New York State Police Incident Report, 11/2/2011 by Investigator
Leonard Caruso

Exhibit 6 – NY Daily News, March 16, 2016 "Ex-Subway pitchman Jared
Fogle attacked in prison fight"

Exhibit 7 - Kingston Times, Jan. 25, 2013 "Taped in court: Judge Williams
orders defendant's mouth sealed"

Exhibit 8 - *US vs. Nacchio*, 05-cr-00545-MSK (District of Colorado) Order

Exhibit 9 - Wares's Affidavit in Support of Waiver of Presence at Trial

Exhibit 10 – April 14, 2016 Google search results of "Clifford Wares,
Waldwick, NY"

Exhibit 11 – Beast Forum member page

Exhibit 12 - West Milford Board of Education letter dated November 21,
2011

**STATEMENT OF FACTS**

A Passaic County Sheriff's Office Investigative Report (PC Report) dated July 31, 2012 provided in discovery sets forth the investigative steps which led to the filing of criminal charges against defendant Clifford Wares in Passaic County, New Jersey [1]  The Report details the steps the Passaic County Sheriff's Office (PCSO) and the New York State Police (NYSP) took leading to Wares's arrest on November 3, 2011 in Smith Clove Park, Monroe, New York.

On November 2, 2011 in furtherance of its criminal investigation, the PCSO obtained consent to make a consensual recording by Kaitlyn (last name redacted and referred to as Minor Victim 1 in the indictment).  According to the PC Report, after obtaining consent, the authorities gave Kaitlyn her phone, and she called Cliff (The Government alleges that the Cliff on this call is the defendant Wares). In the call Cliff indicated that he wanted to meet Kaitlyn.  Kaitlyn asked Cliff to pick her up, but Cliff indicated that he was living in the woods. Cliff allegedly sent a picture of himself to Kaitlyn, which portrayed him living in the woods in a tent. Cliff allegedly sent Kaitlyn other photos of his living situation in the woods.  Cliff further indicated that he was in a park that he had formerly worked at and the park was near a Walmart in Monroe, New York. (*See* Exhibit 1, pp. 3-5)

Further investigation by the PCSO established that a person named Clifford Wares lived in Warwick, New York. Public records revealed that this particular Clifford Wares did not have a current driver's license.  Internet research also showed that person named Clifford Wares had an open case in New York

---

[1] Exhibit 1, July 31, 2012 Passaic County Sheriff's Office Investigation Report

Supreme Court for sending indecent materials to minors, threatening a teen by computer, and for having sexual correspondence with minors.  The PCSO learned that the nearest Walmart to Warwick was at 288 Larkin Drive, Monroe, New York. This Walmart was also close to Smith Clove Park.   The PCSO contacted the NYSP in Monroe and advised the NYSP of the results of the PCSO's criminal investigation and its belief that Wares might be living in Smith Clove Park.  The NYSP advised the PCSO that Wares had an outstanding warrant in New York. (Exhibit 1, p. 4)

The NYSP used a helicopter to locate Wares in Smith Clove Park.   Wares ran from his camp site, but was quickly located and arrested.  After Wares's arrest the NYSP conducted a **warrantless search** of Wares's tent. The warrantless search resulted in various items being seized from Wares's tent. The items seized included: "1 black bag containing batteries, 1 pair of handcuffs, 1 roll of duct tape, 2 Leatherman tools, 1 scissor, 1 lighter, 1 electric hair clipper, 2 pairs of shoe laces, 1 large camping folding knife, 1 hammer/plier, 1 pair of blue latex gloves, 1 NY Driver's license issued to Clifford W. Wares, 1 social security card issued to Clifford W. Wares, lose small notebook pages with handwritten notes, and a notebook with handwritten names of approximately 499 children from the West Milford area."  (Exhibit 1, p. 4)

Upon learning of Wares's capture two PSCO detectives travelled to the NYSP Barracks in Monroe, New York.  Wares had to be transferred to the NYSP Highland Barracks in order to attempt to obtain a post arrest statement from Wares because the video equipment at the NYSP Monroe Barracks was not

working. PCSO Det. Javier Custodio allegedly accompanied Wares while he was transported from Monroe to Highland by the NYSP. (Exhibit 1, pp.4-5)

According to Det. Custodio, while in transit to the Highland Barracks, he orally advised Wares of his Miranda rights and Wares allegedly indicated that he understood those rights.   The alleged post arrest statements made by Wares were memorialized, 9 months later, in the PC Report authored by Det. Custodio. The PC Report reads as follows:

> "we spoke about his time in the woods [Smith Clove Park]. He [Wares] stated that he would charge his phone with the portable charger and take showers utilizing a portable shower bag. He discussed how he lived while staying in the park and that he knew he was wanted. He stated when he heard the helicopter, he knew it was for him, so he ran." (Exhibit 1, p. 5)

When Wares was lodged at the Highland Barracks he was Mirandized on video. The video  shows Wares refusing to speak to the Police. (Exhibit 1, p. 5)

Wares has included with this brief an affidavit in support of his motion to suppress his post arrest statements. The affidavit sets forth the following facts: Det. Custodio had attempted to question Wares in the Monroe Barracks; the attempted questioning took place before Wares was transported to the Highland Barracks; Wares refused to answer any of Det. Custodio's questions.; Wares told Det. Custodio that Wares wanted an attorney; Wares denies having made any post arrest statements to Det. Custodio while Wares was transported by NYSP to the Highland Barracks. [2]

---

[2] Exhibit 2, Affidavit of Clifford Wares in support of motion to suppress his post arrest statements

**MOTION TO SUPPRESS WARRANTLESS SEIZURE OF ITEMS FROM WARES'S TENT**

**Wares is entitled a suppression of all the evidence seized from his tent by the New York State Police because the evidence was seized without a warrant and without any exception to the warrant requirement.**

The Fourth Amendment protects the right of the individual "to be free from unreasonable governmental intrusion." *Terry v. Ohio*, 392 U.S. 1, 9 (1968). Moreover, "the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct." *Id*. at 12 (citation omitted). Its "major thrust is a deterrent one." *Id*. However, the rule also serves "the imperative of judicial integrity." *Id*. (citation omitted). "Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions." *Id*.

The Fourth Amendment to the United States Constitution protects persons and their property from unreasonable searches and seizures by the government and its agents. This protection extends to a tent situated in a public park, including Wares's tent in Smith Clove Park.

The 9th Circuit court of appeals in *U.S. v. Gooch*, 6 F.3d 673 (9th Cir. 1993), did not agree with the government's argument that a tent is analogous to a mobile motor home for purposes of determining the validity of a search. In *Gooch,* police officers received reports that a camper was shooting at others in a campground. The camper/shooter and his female companion were asleep in their

tent when officers arrived at the campground at 5:00 a.m. Without seeking an arrest warrant, the officers ordered the couple out of the tent and placed the man under arrest. The court ruled that a tent is more like a house or a large container than a car; the mere fact that a tent may be moved is not enough to deprive it of the Fourth Amendment protection extended to more permanent structures. The *Gooch* Court noted that the reason for the lesser protection for vehicles was based on the pervasive regulation of motor vehicles and their location on the open road and capacity for movement, rather than the fact that the vehicle is in plain sight. *Gooch*, at 677.

Case law supports the proposition that Wares had both a subjective and an objective expectation of privacy in his tent when the NYSP police conducted their warrantless search of that tent. *See, Katz v. United States*, 389 U.S. 347, 361 (1967). Prior to *Gooch,* the 9th Circuit ruled that a person has an objectively reasonable privacy interest in a tent on private property. *See also LaDuke v. Nelson*, 762 F.2d 1318, 1332 (9th Cir. 1985) amended, 796 F.2d 309 (9th Cir. 1986). "LaDuke's privacy was violated by a flashlight search of his tent and a physical trespass while the Garcias' privacy was violated only through trespass. " "What a citizen "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."; *United States v. Chadwick*, 433 U.S. 1, 7, (1977). See also *Pottinger v. City of Miami*, 810 F.Supp. 1551 (S.D.Fla.1992) (person has reasonable expectation of privacy in belongings and personal effects in public area); *State v. Mooney*, 218 Conn. 85, 588 A.2d 145 (same), cert. denied, 502 U.S. 919, (1991).

Noting the Supreme Court's mantra in *Katz,* that the Fourth Amendment "protects people, not places," the *Gooch* Court held that a "reasonable expectation is not destroyed when a person's tent is pitched instead on a public campground where one is legally permitted to camp. The Fourth Amendment "protects people, not places."

The Government might argue that Wares had no reasonable expectation of privacy in his tent because Wares was not legally permitted to camp in Smith Clove Park.  That argument cannot overcome the Fourth Amendment's warrant requirement. Even if the Court were to determine that Wares was not legally permitted to camp in Smith Clove Park, under current jurisprudence he still had a reasonable expectation of privacy in his tent.  See *United States v. Sandoval*, 200 F.3d 659 (9th Circuit 2000) where the Court of Appeals held that Sandoval had both a subject and objective privacy interest in a tent pitched on Bureau of Land Management (BML) land, arguably without authorization.  *Id*.  "[W]e do not believe the reasonableness of Sandoval's expectation of privacy turns on whether he had permission to camp on public land.  However, such a distinction would mean that a camper who overstayed his permit in a public campground would lose his Fourth Amendment rights, while his neighbor, whose permit had not expired, would retain those rights". *Id*. at 661.  The Court noted that even though Sandoval never obtained permission to camp on BLM land, he was never asked to leave and was never evicted, and that "whether Sandoval was legally permitted to be on the land was a matter in dispute."  *Id*. This same analogy applies to Wares pitching his tent in Smith Clove Park – Wares was never asked to leave nor was he evicted from Smith Clove Park.

Not only did Wares have an objectively reasonable expectation of privacy in his tent, he also had a subjective expectation of privacy in the interior and contents of his tent.  Wares's subjective expectation of privacy is established by the totality of circumstances surrounding his tent's placement in Smith Clove Park. The tent was covered on all sides; the entrance was zipped, and opaque; the tent was surrounded by an obviously man made two foot high stone wall which acted as an outer household threshhold.[3] Wares purposely shielded the interior of his tent from the outside world – he had a reasonable subjective expectation that the tent's contents would be private to the outside world.  The photos of the tent clearly establish that the tent was a residence for Wares, containing clothing, bedding, cooking implements, and other assorted items.

Wares claims the warrantless search of his tent violated his Fourth Amendment rights since he had both a subjective and objective privacy interest in the interior and contents of the tent. The totality of the circumstances of this case supports that conclusion.[4]

Warrantless searches can be valid provided the warrantless search was conducted pursuant to a recognized exception to the general requirement that searches must be made only after a warrant is obtained. Some court recognized exceptions are: exigent circumstances, hot pursuit, plain view, good faith exception. The government has the burden of establishing if any exception to the warrant requirement exists. The government can point to no valid reason why the NYSP could not have obtained a warrant prior to searching Wares's tent without risking destruction of the evidence or risking harm to others.

---

[3] See Exhibit 3, photos of tent
[4] See Exhibit 4 – Wares's Affidavit in support of motion to suppress warrantless seizure of items from his tent

Wares reserves the right to rebut any warrant exception arguments the government may make in its motion filings.

Since the search of Wares's tent was made without a warrant and without any legally recognizable exceptions to the warrant requirement all physical evidence or statements seized from the tent must be suppressed.

**Motion to Suppress Wares's Post Arrest Statements**

Wares moves to suppress statements allegedly made by him to law enforcement agents on November 3, 2011, as well as any fruits of those statements.

If Wares was subjected to custodial interrogation the Government has the burden of proving that (1) he waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 444, 479, (1966) and (2) any alleged statements were voluntary.

Wares's affidavit in support of this motion makes clear that his alleged post arrest statements must be suppressed because he never made any post arrest statements to Passaic County Sheriff's Office Det. Javier Custodio. (Exhibit 2)

In the event the Court determines that Wares did make post arrest statements to Det. Custodio then those statements must be suppressed because the statements were obtained in direct violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). A November 3, 2011 NYSP Incident Report confirms that Wares invoked his right to speak to an attorney when Det. Custodio tried to question

Wares at the Monroe Barracks.[5] Det. Custodio allegedly re-Mirandized Wares (unrecorded and in the back seat of a NYSP vehicle) after Wares asked to speak to an attorney. Clearly, Det. Custodio did not have the right to re-Mirandize Wares.

### *Miranda* Violations

As a means of protecting the Fifth Amendment privilege against self-incrimination, a suspect is constitutionally entitled to receive *Miranda* warnings if he or she (i) is in police custody and (ii) is interrogated by the police. "Custody" has been defined as either arrest or "a restraint on freedom of movement associated with formal arrest cite.

"Interrogation" is defined as questioning or its functional equivalent—that is, statements intended to elicit an incriminating response by the subject. *See Rhode Island v. Innis*, 446 U.S. 291 (1980). There is no violation of the Fifth Amendment where a suspect makes a "spontaneous" statement to police, not in response to interrogation. There can be no doubt that on November 3, 2011 when Wares made his alleged statements that he was in custody, he was interrogated by police and thus entitled to receive Miranda warnings. It is also clear from the Det. Custodio's report that the alleged statements made by Wares in the police vehicle were not spontaneous utterances, but rather direct response to questioning initiated by Det. Custodio.

According to the NYSP after Wares's was arrested in Smith Clove Park he was brought to the Monroe, New York State Police Barracks. (see Exhibit 5) While

---

[5] See Exhibit 5, New York State Police Incident Report, 11/2/2011 by Investigator Leonard Caruso

in Monroe, PCSO Det. Custodio and West Milford Police Det. Pesenti "responded to SP Monroe to interview Wares regarding there[*sic*] pending investigation. Wares refused to answer any questions and requested an attorney."(Exhibit 5 at page 3.) At this point Wares invoked his right to counsel, making it known to Det. Custodio and the NYSP.

Before any custodial statement made in response to police interrogation is admissible at trial, the suspect must execute a voluntary waiver of his or her rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966); (1993). If a suspect invokes his or her right to counsel, the invocation must be honored by police and all interrogation must stop regarding all crimes until the suspect is provided with counsel. **Questioning may resume only if the suspect requests to talk further with police.** (emphasis added) See *Edwards v. Arizona*, 451 U.S. 477 (1981).

The November 2, 2011 New York State Incident Report (NY Report)(Exhibit 5) concerning Wares's arrest and the July 31, 2012 Passaic County Sheriff's Office Investigation Report (NJ Report)(Exhibit 1) concerning Wares's arrest contain major factual discrepancies or omissions related to Wares's alleged post arrest statements. The most salient discrepancies for suppression hearing purposes are set forth below:

1. NY Report indicates Wares refused to answer questions and requested an attorney when Det. Custodio attempted to interview Wares

    - *contrast with* -

    NJ Report does not mention the fact that Det. Custodio attempted to interview Wares in Monroe, NY, that Wares refused to answer any questions, nor that Wares had requested an attorney

2.  NY Report indicates Wares was transported to Highland Barracks by NY Investigators Alma and Solomon. It does not mention Det. Custodio traveling in the back seat  with Wares

    -   *contrast with –*

    NJ Report makes no mention of the presence of Investigator Alma

3.  The NY Report makes no mention of Wares being re-Mirandized or making any post arrest statements

    -   *contrast with –*

    The NJ Report claims Wares was re-Mirandized and made post arrest statements

These major discrepancies and omissions call into question the veracity of Det. Custodio's report and any testimony he may give in opposition to Wares motion to suppress. Wares is entitle to a hearing to confront Det. Custodio's assertions that Wares made post arrest statements. Wares's Affidavit in support of his motion to suppress post arrest statements combined with the above major factual discrepancies entitles Wares to a pretrial hearing as to whether his alleged statements should be suppressed.

One other important factor in this suppression analysis is that Det. Custodio does not state in his report that Wares had requested to speak further with Det. Custodio. Since Wares had invoked his right to counsel at the Monroe Barracks then questioning of Wares could resume only if Wares requested to talk further with police.

Another basis supporting Wares's request for a pretrial hearing and suppression of his alleged post arrest statements is the bad faith of Det. Custodial. New Jersey Court Rule 3:17 provides in part:

"Electronic Recordation

(a) Unless one of the exceptions set forth in paragraph (b) are present, all custodial interrogations conducted in a place of detention must be electronically recorded when the person being interrogated is charged with murder, kidnapping, aggravated manslaughter, manslaughter, robbery, aggravated sexual assault, sexual assault, aggravated criminal sexual contact, criminal sexual contact, second degree aggravated assault, aggravated arson, burglary, violations of Chapter 35 of Title 2C that constitute first or second degree crimes, any crime involving the possession or use of a firearm, or conspiracies or attempts to commit such crimes. For purposes of this rule, a "place of detention" means a building or a police station or barracks that is a place of operation for a municipal or state police department, county prosecutor, sheriff or other law enforcement agency, that is owned or operated by a law enforcement agency at which persons are or may be detained in connection with criminal charges against those persons. Place of detention shall also include a county jail, county workhouse, county

penitentiary, state prison or institution of involuntary confinement where a custodial interrogation may occur.

(b) Electronic recordation pursuant to paragraph (a) must occur unless: (i) a statement made during a custodial interrogation is not recorded because electronic recording of the interrogation is not feasible, (ii) a spontaneous statement is made outside the course of an interrogation, (iii) a statement is made in response to questioning that is routinely asked during the processing of the arrest of the suspect, (iv) a statement is made during a custodial interrogation by a suspect who indicated, prior to making the statement, that he/she would participate in the interrogation only if it were not recorded; provided however, that the agreement to participate under that condition is itself recorded, (v) a statement is made during a custodial interrogation that is conducted out of state, (vi) a statement is given at a time when the accused is not a suspect for the crime to which that statement relates while the accused is being interrogated for a different crime that does not require recordation, (vii) the interrogation during which the statement is given occurs at a time when the interrogators have no knowledge that a crime for which recording is required has been committed. The State shall bear the burden of proving, by a preponderance of the evidence, that one of the exceptions is applicable.

It would be incomprehensible for Det. Custodio to be able to claim he did not know about the New Jersey Court Rule 3:17 requirement that custodial interrogations be recorded. In fact, Det. Custodio's report acknowledges that the reason Wares had to be transferred to Highlands was because the Monroe audio/video recorder was not working. Det. Custodio, thus, purposely tried to

circumvent custodial interrogation recording regulations by *Mirandizing* Wares before proper recording procedure could be followed. Wares maintains that Det. Custodio's alleged failure to record Wares's post arrest custodial statement was a deliberate, improper, and bad faith act on the part of Det. Custodio. This bad faith can be used by the Court to assess Det. Custodio's credibility at a suppression hearing.

Based upon the foregoing Wares is entitled to a suppression hearing in connection with his alleged post arrest statements. Based upon the facts as outlined above Wares's alleged post arrest statements must be suppressed either as having never been made or of having been made in violation of his rights.

## Motion Waiving Right to be Present at Trial

Wares desires to waive his right to be present at his trial scheduled for May 9, 2016. He specifically desires to waive his appearance from jury selection to return of a verdict. In the event of a guilty verdict he intends to exercise his right to be present at sentencing.

### Reasons for Waiving Presence at Trial

Wares is charged with committing sexual offenses against children. The very notion of children being sexually assaulted by an adult causes intense, negative, visceral reactions in the average person. Instances of fellow prisoners attacking those accused of or convicted of sex crimes against children are

common.[6]    There are even many lawyers who would refuse to represent defendants charged with sexually assaulting children. Add to the mix the fact that Wares is alleged to have tried to convince 13 and 14 year old girls to engage in bestiality with a dog - an undeniable social taboo - even if engaged in by consenting adults – and the result is that Wares faces the distinct possibility of having jurors so biased against him that they will unfairly convict him before the government rests it case.

Being wrongfully accused of sexually assaulting children can cause extreme emotional reactions in the accused. The accusations against Wares contributed to his having caused a disturbance in the courtroom at his November 23, 2015 hearing before Judge Salas. As a result of the November 23, 2015 courtroom disturbance Wares was given a competency evaluation. During his evaluation he stated to his competency evaluator that he plans to spit saliva and or blood if he is brought to the courtroom again.

At Wares's March 11, 2016 substitution of counsel hearing he was immobilized, strapped into a wheel chair and had a spit guard placed completely over his head. At that hearing the Court advised Wares that if he did not behave in court during his trial that he would be give up his right to remain in the courtroom during his trial and that his case would proceed in his absence. Those warnings mirrored *Federal Rule of Criminal Procedure* 43 (c)(1)(C) which states a defendant waives continued presence at trial:

---

[6] Exhibit 6, Ex-Subway pitchman Jared Fogle attacked in prison fight - NY Daily News March 16, 2016

"when the court warns the defendant that it will remove the defendant from the courtroom for disruptive behavior, but the defendant persists in conduct that justifies removal from the courtroom."

Wares attended two subsequent court hearings. In both subsequent hearings he was not immobilized nor did he have a mouth guard. His behavior in both these hearings was proper and non-eventful. Both those hearings were short in duration. None of the sexually graphic facts related to this case came up at those hearings. Wares believes that the upon hearing some of the sexually graphic facts in the trial setting he will become emotionally upset and possibly cause an outburst which would lead to his being removed from the courtroom.

Wares's November 23, 2015 court room disturbance was not an isolated event. On January 16, 2013 Wares was being sentenced in New York State Court for crimes similar to the crimes in his pending federal indictment. During his sentencing hearing Wares became so disruptive the court had to have Wares gagged. Court officers covered Wares's mouth with duct tape. Wares continued to disrupt the proceedings while gagged and had to be removed from the courtroom once more.[7] Wares submits that hearing the emotionally sensitives facts reiterated in open court is a trigger which leads to his becoming disruptive.

The above events are an omen that Wares will lose control at some point in his upcoming trial, requiring his forcible removal.

If Wares were to be forcibly removed from the courtroom, in full view of the jury, then that image would have a devastatingly prejudicial effect and preclude him from any chance of having a fair trial. After an outburst requiring

---

[7] Exhibit 7, Kingston Times, Jan. 25, 2013 "Taped in court: Judge Williams orders defendant's mouth sealed"

Wares to be forcibly removed from the courtroom no instruction from the Court would be able to remove the prejudice that would result.

In order to protect against the prejudice that would inevitably result from being forcibly removed from the courtroom during trial Wares wants to waive his right to be present at his trial. He argues that his waiver is permissible under *Federal Rule of Criminal Procedure* 43.

In support of this argument Wares cites the waiver analysis made in *US vs. Nacchio*, 05-cr-00545-MSK (District of Colarado)[8] where a defendant waived his right to be present at re-sentencing and the government objected to the defendant's intent to waive his presence. One purpose of *Rule* 43 is to ensure a defendant's rights under the confrontation clause of the Sixth Amendment and the due process clause of the Fifth Amendment of the United States Constitution. (cites omitted, see page 4).

The *Nacchio* Court explained that the "essence of a right is the freedom to exercise it or not." If one cannot waive a right, then it ceases to be a right and becomes an obligation. (cites omitted, page 4). Wares wants to freely and voluntarily waive his right to attend his trial rather than to have his absence deemed "voluntary" only after a court room disturbance.

It would be an absurd interpretation of constitutional law, indeed, if the Court ruled that in order for Wares to exercise his right to voluntarily waive his presence at trial he must first cause a continued disturbance at trial or flee from justice prior to the start of trial.

---

[8] Exhibit 8, US vs. Nacchio order attached

Causing a disturbance at trial or fleeing from justice would expose Wares to contempt of court and additional criminal charges. Wares knows of no other constitutional right which can be waived only if a defendant first commits some type of improper or illegal conduct.

Wares could find no case law in which a defendant proactively made a voluntary and knowing waiver of the right to waive his appearance at trial. The cases dealing with waiver and more specifically *Rule* 43 involve the courts imputing knowledge and voluntariness only after the defendant either fled from justice or caused a disturbance in court.

Wares argues that if his waiver is put on the record prior to trial then his waiver could be deemed truly voluntary and knowing. Contrast that to the defendants who have been imputed to have made a voluntary and knowing waiver of the right to be present at trial only after causing a disturbance or fleeing from justice. (See *Diaz v. United States*, 223 U.S. 442 (1912) and *Illinois v. Allen*, 397 U.S. 337, 346–47 (1970))

Since no waiver can be effective unless it is both informed and voluntary Wares requests a hearing so that the Court may question him in order to establish that his waiver is informed and voluntary.

Attached to this brief is an affidavit signed by Mr. Wares in which he acknowledges the rights he would be giving up by waiving his presence at trial.[9]

---

[9] Exhibit 9, Wares' Affidavit in Support of Waiver of Presence  at Trial

**Jury Charge requested if the Court allows Wares to waive his presence at trial**

If the Court grants Wares's motion to waive his presence at trial then he would request the following jury instruction be given both before opening statements and after closing arguments:

As you know, the defendant is (was) absent from the trial. You should not speculate about the reason for his absence. You are not to consider for any purpose or in any manner in arriving at your verdict the fact that defendant is (was) not present at trial. That fact should not enter into your deliberations or discussions in any manner, at any time. The defendant is entitled to have the jury consider all evidence presented at trial. He is presumed innocent even if he is not present.[10]


**Motion requesting Wares's name to be substituted with a pseudonym at trial in order to conceal his identity from the jurors**

Wares seeks an order that his real name not be used at trial and instead that he be allowed to proceed anonymously through the use of a pseudonym. The reason for this anonymity request is based upon the amount of prejudicial information that currently exists on the internet when a Google search is conducted of the term "Clifford Wares Warwick NY"[11] .  These first three pages of a Google search of Clifford Wares Warwick NY contain 17 articles which relate

---

[10] Modelled on New Jersey Superior Court Model Jury Charges
[11] Exhibit 10, April 14, 2016 Google search of the search term "Clifford Wares Warwick, NY"

either to Wares's past criminal history or the present case.[12] Any one of these 17 articles, if read by a juror, could deprive Wares of a fair trial.

Wares expects that at almost every break in his trial, the Court will instruct the jurors not to discuss Wares's case with anyone, not to read any articles or search the internet about this case. This warning is standard practice in courts throughout the country and certainly in the District of New Jersey. Wares also expects, based upon the combined factors of easy access to the internet and human curiosity, some of the jurors will disobey the Court's instructions and search for information about Wares on the internet. Such a search, whether performed by a juror or a juror's family member or friend, will expose a juror to highly prejudicial on-line articles. Furthermore, it would be most unlikely that any juror would tell the Court about his or her disobedience to the instruction not to read about this case.

Wares faces a life sentence if convicted of all the charges in the indictment. The possibility of a life sentence more than justifies Wares request that all reasonable procedures be utilized to ensure that he has an unbiased jury throughout the trial. The emotionally charged child sexual assault offenses and social taboo subjects related to this case offer additional rationale for Wares being granted anonymity at trial.

The essence of Wares's argument for wanting to proceed to trial anonymously –a request he makes regardless of whether the Court grants his motion to be voluntarily absent from trial – is that Wares does not believe every

---

[12] These internet search results are not limited to Google. Similar results are found by using the same search terms on Bing or Yahoo.

juror will follow the Court's instruction not to search the internet and the distinct possibility of inadvertent juror bias resulting from 21st century internet use.

Modern social media and the internet have created a society that reaches conclusions based upon public polls, news stories, and social media posts rather than based upon proven facts. Many people today get their news from Facebook, Twitter and other online sources. News is often broadcast by people posting news on Facebook, Twitter, and other similar online venues.

There is a distinct and important difference between online media sources like Facebook and Twitter and traditional papers like the New York Times or Star Ledger. The difference is that on a site like Facebook or Twitter the recipient of news has no control of what other users may post.  If a juror is a regular Facebook or Twitter user then he or she is subjected to an endless barrage of posts from the juror's friends. A juror's friend may find out that the juror is sitting as a juror on Wares's case, do an internet search and post prejudicial information about Wares on a Facebook or Twitter post which is then seen by the juror. News posts appear on Facebook and Twitter posts every second of every day. One cannot control what others post on social media. Wares believes that the possibility of a juror seeing negative news stories about him is a real possibility. The juror tainting media could be the result of intentional searching by a juror or from an unintentional social media posting by a juror's Facebook or Twitter "friend".

### The victims are given anonymity, so why not Wares?

The alleged minor victims in this case are being referred to only by first names. If the alleged victims in this case are afforded anonymity then why not Wares? The Government's November 12, 2015 brief in support of its motion to

protect identity of victims to not have their names revealed at trial cited *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, l 068-69 (9th Cir. 2000)  for the proposition that Courts will permit a party to proceed under a pseudonym where "the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity."

"What's in a name? That which we call a rose by any other name would smell as sweet;" said Juliet.[13] Wares's name is not an element of the offense.  The case against him will be just as strong whether the jury knows him as Clifford Wares or John Doe. There is no necessity for the government to have to use the name Clifford Wares in order to prove its case against Wares, just as there is no need to use the victims' real names. Allowing Wares to proceed anonymously by use of a pseudonym will not cause any prejudice to the government.

The benefit of allowing Wares to proceed anonymously will afford him enormous protections against any curious jurors who may be tempted to search the internet while at home during breaks in trial. It will also prevent curious family members of jurors from reading information about Wares on the internet and relaying that prejudicial information to a juror. The protection afforded Wares  in allowing him to proceed with a pseudonym substantially outweighs any harm that the Government would suffer by allowing Wares to proceed with a pseudonym. In balancing the fairness of this request the Court should not neglect the fact that Wares is facing a life sentence.

---

[13] *Romeo and Juliet,* Act II Scene II, William Shakespeare

Allowing Wares to proceed with a pseudonym is a non-drastic safeguard that will go a long way to ensure he receives a trial which is not prejudiced by the plethora of prejudicial information about him that currently exists on the internet.

Anonymity of a litigant is not a completely novel idea. Courts have permitted plaintiffs in civil trials to proceed anonymously for more than two decades. See, e.g., *Roe v. Aware Woman Ctr. for Choice, Inc*., 253 F.3d 678, 684–85 (11th Cir. 2001); ("The ultimate test for permitting a plaintiff to proceed anonymously is whether the plaintiff has a substantial privacy right which outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings.") Wares argues that he has a substantial Sixth Amendment right to a fair trial, a right which can only be obtained with an unbiased jury. His Sixth Amendment right to a fair trial overcomes any presumption of openness that might require his real name be used at trial.

Courts have allowed party anonymity in civil trials despite First Amendment freedom of the press concerns. See *Doe v. Stegall*, 653 F.2d 180 at 185 (5th Cir. 1981) (Party anonymity does not obstruct the public's view of the issues joined or the court's performance in resolving them. The assurance of fairness preserved by public presence at a trial is not lost when one party's cause is pursued under a fictitious name.) If the Court grants Wares's request for anonymity both regular citizens and the press will have the ability to scrutinize the judicial process involved in his case.

The negative consequences that would result from even one juror conducting an internet search of Clifford Wares is more than enough to overcome any argument by the Government that his real name must be revealed to the jury.

**Defendant objects to the authenticity of exhibits disclosed by the government and leaves the government to its proofs**

The Government has provided the defendant with a large amount of Facebook messages, email messages and other social media postings. Some of the messages were allegedly written by Wares and some allegedly written the victims and friends of victims. Many of the emails, texts and messages have the following characteristics:

- It is not apparent how the messages came into the possession of the government
- It is not apparent who created the messages
- It is not apparent how the messages were created
- It is not apparent where the messages were created (neither IP address or physical location)
- It is not apparent on what type of device the messages were created (smart phone, laptop computer, desk top computer)

Wares refuses to concede that any of the exhibits are authentic.

Many government exhibits contain impermissible and unduly prejudicial hearsay and must be redacted before being admitted into evidence.

The government is left to its burden of establishing the authenticity of any exhibit it intends to enter into evidence.

**Motion *in limine* to preclude the Government from introducing any evidence that Wares was a member of the on-line forum Beast Forum at BeastForum.com**

The discovery provided by the Government reveals that the father of Minor Victim 1 conducted an internet search of email address "cliff_dog69@hotmail.com" which revealed that email address to be associated with a member of Beast Forum, a bestiality on-line forum.[14] There is no evidence to establish that Wares knew about the Beast Forum account. There is no evidence to prove that Wares created the account. It is just as much likely that the subject Beast Forum account was created by someone other than Wares. There is not a scintilla of evidence which can establish that Wares created the Beast Forum account which has his picture.

Bestiality is considered a sexual perversion by an overwhelming proportion of the population. There is no question that jurors would form an unfair bias against Wares if they thought he was a member of Beast Forum. If any evidence of the Beast Forum account is admitted into evidence then Wares will suffer undue prejudice which will deprive him of the right to a fair trial.

In the event that the Court denies the motion *in limine* concerning the Beast Forum evidence then in the alternative Wares would request the jury be given a limiting instruction advising them that it would be impermissible to use

---

[14] Exhibit 11 – Beast Forum member page

evidence of Wares being a member of Beast Forum as proof that he committed any of the crimes in the indictment.

**Motion in limine to preclude the Government from introducing any evidence of a letter sent by the West Milford Board of Education to parents of children in the West Milford School system to ask their children if the children had made contact with Clifford W. Wares**

The discovery provided by the Government reveals that at the request of the West Milford Police a letter dated November 21, 2011 was sent by the West Milford Board of Education to parents of children in the West Milford School system to ask their children if the children had made contact with Clifford W. Wares.[15] Wares argues that anything in the letter is hearsay and must be excluded. Furthermore, he argues that the subject matter of the letter is not relevant to proving any elements of the charges in the indictment and must excluded pursuant to *Fed. R. Evid.* 402.

Any mention of this letter or its contents would cause unfair prejudice in the jury against Wares. Therefore, any mention of the letter or its contents must be excluded from use at trial.

---

[15] Exhibit 12, West Milford Board of Education letter dated November 21, 2011

**Motion to compel Government to produce copies of photographs allegedly sent by smart phone by Minor Victim 1 to Wares**


The discovery provided by the Government reveals that "Kaitlyn had sent nude photos of herself, which he [Wares] made her do."[16] The defense has not viewed any such photo in discovery. If an electronic record exists of the nude photos that were allegedly sent to Wares then the defense it entitled to inspect the photos. Wares is also entitled to know if the records of the phone used to send the alleged nude photos were searched by the government. If a search of the phone and/or service provider records (Wares believes the service provider for the phone in question was Verizon Wireless) established that no nude photos were sent from the phone in question then such absence of nude photos would be to be discoverable under *Bradey.* The lack of any nude photos on Kaitlyn's phone would be evidence Wares could use to cast doubt on the veracity of the witness.


**Motion requesting Rule 404(b) hearing**

Wares requests the disclosure of any evidence the Government seeks to introduce pursuant to *Fed. R. Evid*. 404(b).

The government is likely to attempt to introduce "other crimes" evidence in its case in chief pursuant to *Fed. R. Evid*. 404(b).   This rule "generally prohibits the admission into evidence of extrinsic acts intended to prove a defendant's

---

[16] See page 3 of Exhibit 1,  July 31, 2012 Passaic County Sheriff's Office Investigative Report

propensity for crime or to suggest to the jury unfavorable inferences reflecting on his character."  *United States v. Scarfo*, 850 F.2d 1015, 1018 (3d Cir.), *cert. denied*, 488 U.S. 910 (1988).  However, if offered for a proper purpose, evidence of other crimes or wrongs is admissible, "subject only to the ordinary limitations under Rules 402 and 403."  *Id*. at 1019.

There are four distinct steps that must be satisfied before prior bad act evidence may be introduced at trial:

(1) it must be offered for a proper non-propensity purpose that is at issue in the case; (2) it must be relevant to that purpose; (3) its probative value must not be outweighed by the danger of unfair prejudice under Rule 403; and (4) it must be accompanied by a limiting instruction, if one is requested. Caldwell, 2014 WL 3674684, at *7 (citing United States v. Davis, 726 F.3d 434, 441  (3d  Cir.  2013))

Wares was convicted of and is serving a sentence in New York State for crimes which are similar to the crimes in this indictment. When this case was pending in New Jersey Superior Court, the Passaic County Prosecutor filed a motion to admit evidence of Wares's prior New York conviction in order to establish his modus operandi and identity. Wares assumes the Government will make a similar argument in this case. Wares objects to any evidence of his prior convictions being admitted in his case – if evidence of his prior convictions is admitted, for any purpose - the probative value will be so outweighed by the danger of unfair prejudice that he will be denied his Sixth Amendment right to a fair trial.

Wares anticipates his trial will include testimony from two separate Minor Victims (Minor Victim 1 and Minor Victim 2 are named in the indictment) as well

as testimony from, or about, two additional minor victims not named in the indictment. The alleged modus operandi used in connection with these four victims is identical. There is no need for the Government to introduce evidence of Wares's prior New York conviction in order to establish his alleged modus operandi or identity in this case – admission of evidence of Wares New York case would be overkill on the part of the Government – it would be unduly prejudicial and would deny him a fair trial.

The identity and modus operandi evidence related to Minor Victim 1 will help establish his modus operandi and identity in the Government's case involving Minor Victim 2. Any identity and modus operandi evidence associated with the two other alleged victims not named in the indictment, if admitted, would further help prove modus operandi and identity. Wares requests a 404(b) hearing if the Government intends to proffer evidence of any victims not mentioned in the indictment.

### Excessive use of 404(b) evidence must be precluded

The Government's trial exhibit list has a section entitled "404B Evidence". There are 14 separate 404(b) exhibits listed on the most recent version of the trial exhibit list. Wares submits that a separate 404(b) analysis, as set forth above, must be done for each piece of 404(b) evidence being offered into evidence by the Government. Wares argues that once the Court rules that evidence of other crimes or bad acts can come in under 404(b) then each additional piece of 404(b) evidence the Government seeks to admit must be given greater scrutiny. The more 404(b) evidence allowed into evidence the greater the chance of undue

prejudice. Wares contends that 14 pieces of 404(b) evidence, if all admitted, would amount to overkill.

Before any 404(b) evidence is allowed into evidence the Government must first satisfy the 4 prong test, therefore, the Government is left to its proofs on each of the 14 proposed 404(b) exhibits listed on its exhibit list.

### Request for limiting instruction and supplemental *voir dire* question

In the event that the Court rules that evidence related to Wares's New York State convictions or other bad acts can be admitted pursuant to 404(b) then Wares would request the Court to give a limiting instruction to the jury at the time any 404 (b) evidence goes into evidence.

Wares would also request the during jury *voir dire* prospective jurors be asked if they could be fair and impartial even if they heard evidence at trial about Wares having a prior conviction for offenses similar to the offenses in the indictment or if they heard evidence of other bad acts committed by Wares.[17]

### Motion to dismiss indictment based upon violation of the Interstate Agreement on Detainers Act

Wares maintains that his indictment must be dismissed because his trial was supposed to have taken place prior to February 26, 2016. Wares maintains that any waiver of speedy trial consented to by Wares or his legal counsel after

---

[17] The proposed limiting instruction and *voir dire* language will be somewhat dependent on the Court's ruling on the Government's 404 (b) motion

February 26, 2016 had no legal consequence since after February 26, 2016 the case should have been dismissed. Logic dictates that one cannot agree to a continuance in case that does not exist.

Wares maintains that since he never signed any continuance in connection with the IAD that any continuance attempt was void from the start. His argument is similar to the concept of statute of frauds, *i.e.*, if the continuance is not in a writing signed by both interested parties then the oral continuance is not legally valid.

Accordingly, the Court should order the indictment dismissed and order Wares be sent back to the New York State Department of Corrections to finish serving his New York State sentence.

## Motion to Severance of Counts 1-3 from Counts 4-6

Wares requests that the Court sever Counts 1-3 of the indictment from Counts 4-6. Counts 1-3 relate to Minor Victim 1 whereas Counts 4-6 relate to Minor Victim 2. Wares argues that there is no relationship between the crimes committed against Minor Victim 1 and Minor Victim 2.

*Federal Rule of Criminal Procedure* 8 governs joinder of offenses and joinder of defendants. It states:

(a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged — whether

felonies or misdemeanors or both — are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Even If joinder were proper, severance is necessary under Rule 14 to prevent prejudicial spill-over of evidence from the counts related to Minor Victim 1 into the counts related to Minor Victim 2. *See Graci*., 504 F.2d at 413 ("Rule 14. . . only comes into play after it has first been determined that joinder was permissible under Rule 8"). Under Rule 14, "[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses. . . in an indictment or information or by such joinder for trial together, the court may order an election or separate trials or counts, grant severance of defendants or provide whatever other relief justice requires." Fed. R. Crim. P. 14. See also *United States v. Taylor*, 1992 333589, *2 (E.D. Pa. Nov. 9, 1992)

As the U.S. Supreme Court has declared, a severance should be granted "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993).

Both of these factors requiring severance are present here.

First, a joint trial of the Counts involving solely Minor Victim 1 and the Counts involving solely Minor Victim 2 would prevent Wares from receiving a fair trial. The evidence proffered by the government in support of the Minor Victim 1 Counts will prejudice the jury and impair Wares's ability to fairly defend himself

against the Minor Victim 2 Counts. Wares should not have the jury's consideration of his (lack of) involvement in the Minor Victim 1 Counts case "tainted" by evidence that the government may introduce relating to the Minor Victim 2 case.

Second, the jury cannot reasonably be expected to ignore evidence introduced in support of the Counts in involving Minor Victim 1 when considering the Counts involving Minor Victim 2. *Zafiro*, 506 U.S. at 538. The Third Circuit has stated that a trial court should grant a severance where a jury cannot "reasonably be expected to compartmentalize the allegedly prejudicial evidence in light of the quantity and limited admissibility of the evidence." *Eufrasio*, 935 F.2d at 568 (quoting *United States v. DePeri*, 778 F.2d 963, 983 (3d Cir. 1985)); see also *Serafini*, 7 F. Supp. 2d at 554 (severing perjury count from campaign finance violations where "the potential common thread for the purposes of joinder. . . is exceptionally thin" and defendant would "suffer clear and substantial prejudice" if his perjury case is tried with the substantive counts). "Reliance on the efficacy of limiting instructions is especially dubious as to evidence which does have some probative value as to a defendant, but which would have been excluded under Rule 403 in a separate trial." *United States v. Gallo*, 668 F. Supp. 736, 753 (E.D.N.Y. 1987).

Accordingly, severance of the Counts involving Minor Victim 1 from the Counts involving Minor Victim 2 is necessary under Rule 14 to avoid prejudice to Wares.

**Motion for a Wade hearing to establish whether any out of court identification is unconstitutionally suggestive and thus inadmissible as evidence**

The discovery provided in this case indicates that some of the victims made out of court identifications of Wares. Defense counsel was advised that with at least one photo array in which Wares was identified cannot be located.

Wares objects to any witness being allowed to testify as to identifying Wares out of court unless the photo array is produced. It would be unduly prejudicial to allow witnesses in court identification bolstered by an out of court identification without the actual photo array being produced at trial.

Improper suggestiveness of identification procedures is a topic dealt with extensively by the Supreme Court. (*See Darden v. Wainwright,* 477 U.S. 168, (1986) "The use of showups has long been condemned by this Court, precisely because they can result in unreliable identifications. Similarly, the Court has condemned the use of photo arrays in which the suspect's photograph 'is in some way emphasized.'" ) The suggestibility of an out of court identification cannot be challenged unless the identification can be recreated in court. Wares argues he is entitled to a pretrial hearing if the Government wants to admit evidence of any out of court identification.

Wares reserves the right to supplement this argument in his response brief in the event that the government specifically identifies an out of court identification it intends to use at trial. Wares requests a pretrial hearing for any such out of court identification.

**Motion to compel government to preserve and produce rough notes**

Wares seeks the entry of an Order requiring that any notes prepared by investigators involved in this case, whether made during or immediately following the interrogation of government witnesses be preserved and disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500.

In *United States v. Vella*, 562 F.2d 275 (3d Cir. 1977), the court held:

The rough interview notes of FBI agents should be kept and produced so that the trial court can determine whether the notes should be made available to the applicant under the rule of *Brady* v. *Maryland,* 373 U.S. 83, (1963), or the "Jencks Act." See also *United States v. Ammar*, 714 F.2d 238 (3d Cir. 1983) (following the holding in *Vella*); *United States v. Ramos*, 27 F.3d 65, 68 (3d Cir. 1994) (same).  It is therefore clear that the government should advise all law enforcement agencies involved in this action to retain, preserve and produce all rough notes for subsequent disclosure to the defense.

**Rough notes of Det. Custodio**

Wares specifically request the rough notes of Det. Custodio be provided before any *Miranda* hearing. These notes are specially important to the *Mianda* hearing because Det. Custodio's report in connection with Wares's post arrest statement conflict with the NYSP report and Det. Custodio's report was written 8 months after the NYSP report.

**Motion to dismiss the indictment in the event that evidence or investigative notes were destroyed.**

If evidence has been lost in bad faith or destroyed, the indictment should be dismissed. *Arizona v. Youngblood*, 488 U.S. 51 (1988); *California v. Trombetta*, 467 U.S. 479 (1984); *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993). Alternatively, the court may consider other less drastic sanctions including suppression of secondary evidence or testimony or any other just and equitable remedy.

**Motion to compel timely production of all Jencks act material**

In the interests of judicial efficiency and economy, the government should provide early disclosure of Jencks materials.  The government must retain rough notes and reports of its witnesses since the failure to preserve that evidence can constitute grounds for reversal.  *See Government of Virgin Islands v. Testamark*, 570 F.2d 1162 , 1165-66 (3d Cir. 1978) (discussing duty to preserve evidence generally).  While the government does not generally have a duty to disclose the rough notes and reports of one of its witnesses until that witness testifies, 18 U.S.C. § 3500; *see Higgs*, 713 F.2d 39 , 44 (3d Cir. 1983), *cert. denied*, 464 U.S. 1048 (1984), the trial court is empowered to control discovery and thus may order the government to disclose Jencks materials before trial.

**Motion to be permitted to file additional motions as the need arises**

Due to the nature of the instant case and the legal issues that may arise as the result of defense investigation and continuing discovery, Mr. Wares

anticipates that it may become necessary to file additional motions, and he requests that, in the interest of fundamental fairness, he be permitted to do so until the date set for trial.  He will, of course, notify the government of his intention to file any motions as soon as it becomes apparent that a motion is necessary.

## Conclusion

For the foregoing reasons, Mr. Wares respectfully requests that his requests for relief be granted.

*/s/Thomas Ambrosio*
_____
Thomas Ambrosio
Attorney for Clifford Wares